

FIL
MAY 1

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

|  |  |
|---|---|
| GERRY OGLE, as Special Administrator of the Estate of Anthony Andrew LaRocco, Deceased, and as Guardian ad litem for Brandon Tex Ogle and Casey James Ogle | * * * * * |
|  | * |
| Plaintiff, | * |
|  | * |
| -vs- | * |
|  | * |
| RYAN LANTZ, in his individual capacity, and SCOTT SHELDON, in his individual capacity. | * * * |
|  | * |
| Defendants. | * |
|  | * |

CIV 08-4148

MEMORANDUM OPINION AND ORDER

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

Plaintiff, Gerry Ogle, as Special Administrator of the Estate of Anthony LaRocco, deceased, and as Guardian ad litem for their minor children, filed an Amended Complaint against Ryan Lantz and Scott Sheldon in their individual capacities. The Amended Complaint alleges the following three claims against both Defendants: (1) a Section 1983 claim based upon the use of excessive force in violation of the Fourth Amendment; (2) a wrongful death claim under South Dakota law; and (3) a Section 1983 claim for the violation of LaRocco's minor children's substantive due process right under the Fourteenth Amendment to a continued relationship with their father. Defendants have moved for summary judgment on all claims. The motions have been fully briefed and a motion hearing and argument was held before the Court on April 9, 2010, during which time Plaintiff withdrew her substantive due process claim. For the reasons set forth below, Defendants' Motions for Summary Judgment are granted.

## BACKGROUND AND RELATED FACTS

The decedent, Anthony LaRocco ("LaRocco") had a history of depression and psychological health problems. (Gerry Ogle Dep. 16-17, 21, 39, 41-44.) He had ADHD, was

bipolar, and possibly schizophrenic. (Gerry Ogle Dep. 39:13-14.) During certain bouts of depression, LaRocco threatened suicide. (Gerry Ogle Dep. 50:4-51:9.) One time LaRocco called law 911 and Defendant, Ryan Lantz ("Lantz"), was one of the law enforcement officers who came to the trailer that LaRocco shared with his fiancee, Gerry Ogle, and their two children to investigate. (Gerry Ogle Dep. 52:3-55-17.) LaRocco had fled by the time the officers had arrived. (Gerry Ogle Dep. 53:15-17; Lantz Dep. 39:6-9.) In February 2007, LaRocco climbed upon the roof of Stables Bar and Café in Harrold, South Dakota, and removed his shirt in cold weather and threatened suicide although the roof was not high enough to have injured LaRocco seriously even if he had jumped. (Gerry Ogle Dep. 47:17-50:3.) Law enforcement officers spent approximately two hours talking to LaRocco until he came down from the roof and LaRocco was then taken into custody. (Leidholt Dep. 14:7-15:23; Sheldon Dep. 45:2-5.)

On October 20, 2007, at 7:26 p.m., a telephone operator called 911 stating that she had received a call from a gentleman stating that he was bi-polar, manic depressive, that he had two small children and told the operator not to send the police. The telephone operator also informed 911 that the caller stated he had a gun and had been drinking. (Pl.'s Ex. 1.) At 7:30 p.m., a counselor at the Missouri Shores crisis line called 911 to relay a call that she received from a gentleman who said that he was bi-polar, manic depressive, and had been drinking. (Pl.'s Ex. 1.) The counselor said the caller stated that he had two small children and that if the counselor sent law enforcement to his house, "people are going to die." (Pl.'s Ex. 1.) The counselor informed the 911 operator that she thought she had heard shots fired during the call. (Pl.'s Ex. 1.) At 7:34 p.m. on October 20, 2007, LaRocco called 911 and stated that he had a 9 mm gun in his pocket and that he would shoot himself in the head. LaRocco stated during this call that if he saw headlights coming he would pull the gun out and pull the trigger. He stated that he was very dangerous and that he would blow up fuel pods on the James Ogle farm if he saw headlights. (Pl.'s Ex. 1.) LaRocco called 911 again at 7:37 p.m. that evening stating that he had two small children who were in Jim Ogle's trailer and that they would be alone in the trailer. (Pl.'s Ex. 1.) He told the officers not the hurt the children and told the 911 operator that they should call their mother at Stables bar to come watch them. LaRocco stated that he was the one who had been on top of the bar recently and that officers had previously been to his house. He said that he would leave the trailer and would put a gun to the officers and that they would be able to shoot him

2

with no problem. LaRocco stated that he was tired of the suffering that Jim Ogle and others in his family had put him through and that Jim Ogle was the one who was going to pay for all of this. LaRocco told the operator that he could not "handle it anymore" and just wanted someone to help him.

At approximately 7:36 p.m., the 911 operator called Deputy Officer Bob Duncan ("Duncan") with with the Hughes County Sheriff's Office informing him that she just received a call from a man in Harrold who stated that he was manic, bi-polar and drunk. (Pl.'s Ex. 1.) The operator informed Duncan that the man was calling from the Jim Ogle Farm and that there were five fuel pods on the property and that he would start firing at the fuel pods if officers got within ten miles of the property. (Pl.'s Ex. 1.) The operator stated that LaRocco stated he had a 9mm in his back pocket and will shoot himself if he does not shoot other people first. (Pl.'s Ex. 1.)

Duncan called Hughes County Sheriff Mike Leidholt on his cell phone and relayed the situation to him. (Pl.'s Ex. F at 1.) Leidholt told Duncan to inform the Sully County Sheriff Office because LaRocco lived in Sully County and to activate the High Risk Entry Team. (Pl.'s Ex. F at 1.) Duncan called the Sully County Sheriff Office and relayed the situation to Deputy MikeVarilek. (Pl.'s Ex. F at 1.) The officers decided to stage at the airport west of Harrold before continuing on to the residence on the Jim Ogle farm. (Pl.'s Ex. F at 1.)

Ryan Lantz was on duty and serving in his capacity as a South Dakota Highway Patrol trooper that evening, a position he had occupied since he had graduated from the Highway Patrol Training Academy in September 2005. (Pl.'s Ex. G at 13; Lantz Dep. 91:21-25.) While on patrol, he overhead a request by Duncan on the radio to page the entry team. (Pl.'s Ex. L at 1.) Lantz contacted Pierre Police Dispatch at approximately 7:47 p.m., asking "what do we have going on here, that whacko again?" (Pl.'s Ex. 2; Pl.'s Ex. G at 21.) Lantz was aware of the Stables Bar incident in February 2007 involving LaRocco's threats of suicide and once responded to the home shared by Ogle and LaRocco to investigate a 911 call made by LaRocco. (Lantz Dep. 34:14-22, 39:6-9.) The dispatcher advised Lantz that they had an individual who was threatening suicide by cop, was in a trailer with two kids and fuel pods in the yard, and had a 9mm in his back pocket. (Pl.'s Ex. 1.) The dispatcher stated that LaRocco said if anyone gets

3

too close, he will either begin shooting them or shoot himself. (Pl.'s Ex. 1.) Lantz asked whether the entry team had been activated and the dispatcher said that it had. (Pl.'s Ex. 1.) Lantz then contacted his direct supervisor, Sergeant Chris Forster, informed him of what was going on, and Forster authorized Lantz to provide assistance. (Pl.'s Ex. L at 1; Lantz Dep. 6:13-16.) This would be Lantz's first experience in a crisis situation. (Lantz Dep. 22:6-13.)

Gerry Ogle had received several calls from LaRocco that evening while she was working at Stables Bar in which LaRocco sounded upset. (Gerry Ogle Dep. 61:3-17.) At the time, LaRocco was at home watching their two boys. During the last call at approximately 8:30 p.m., LaRocco told Ogle that he was upset and that he was going to get his BB gun and go out and make the cops think it was a real gun and shoot him and that he loved her. (Gerry Ogle Dep. 62:13-63:8.) Ms. Ogle was not overly concerned as LaRocco had made threats of suicide before and she believed that they were just a way for him to get attention. (Gerry Ogle Dep. 63:14-23, 50:4-51:20.) She asked her mother, who was eating at Stables Bar, to go and pick up the children. Shortly after that, Ms. Ogle's eldest son called her at the bar and said that his dad had left and that he wanted to be picked up. Ogle's mother returned to the bar with the kids and Ogle drove with them to drop the kids off at her aunt and uncle's home.

After Forster authorized Lantz to provide assistance, Lantz called Duncan and was told that officers would be staging at the Harrold airport until the entry team arrived and to meet them there. (Pl.'s Ex. L at 1; Lantz Dep. 6:9-12.) At approximately 8:05 p.m., Lantz radioed Pierre State Radio Dispatch that he was "headed to Harrold to assist [Duncan] with a situation of a male subject threatening suicide with children in the house . . . ." (Pl.'s Ex. H at 1.) Duncan met officer Varilek and Game Fish & Parks Conservation Officer Casey Griffith at the airport. (Pl.'s Ex. F at 1.) As the officers were waiting to meet up with the High Risk Entry Team, they witnessed a vehicle coming down an adjacent gravel road at a high rate of speed and perform a high speed u-turn. (Pl.'s Ex. F at 1.) Duncan thought that staging area had been compromised and followed the vehicle to initiate a traffic stop. (Pl.'s Ex. F at 1.) The vehicle refused to stop upon Duncan's activation of his emergency lights and sirens and Duncan radioed in what had happened and that he and the other officers were in pursuit of the vehicle. (Pl.'s Ex. L at 1; Pl.'s

4

Ex. P at 2.) Lantz was approximately one mile west of Harrold upon hearing the radio transmission of the pursuit and he immediately activated his emergency lights and siren and advised State Radio Communications at approximately 8:47 p.m. that he was following the other officers in pursuit of a red ford F150 supercab. (Pl.'s Ex. H at 1; Pl.'s Ex. G at 26.)

While at her aunt and uncle's home, Gerry Ogle heard sirens and realized that LaRocco had in fact called the cops. Ogle's mother dropped her off at Stables Bar so Ms. Ogle could get her vehicle and intercept the cops to inform them that if LaRocco had a gun, it was only a BB gun.

Officers continued to give the location, speed, and direction of travel during the pursuit. (Pl.'s Ex. P at 3.) Shortly after initiating the pursuit, officers radioed that the subject was waving a pistol out the driver's side window. (Pl.'s Ex. P at 2; Pl's Ex. G at 25.) Jim Ogle, Gerry Ogle's father, was working at Stables Bar that evening and was aware that his daughter had received calls from LaRocco and had left work around 8:30 p.m. (Jim Ogle Dep. 13:10-11.) When Jim Ogle left work, he drove out to Gerry and LaRocco's place to check on his daughter. On his way to their home, Jim Ogle saw the police lights coming down the road north of the trailer. (Jim Ogle Dep. 13:23-14:10.) Jim Ogle proceeded to drive out to meet the vehicles and noticed that they were pursuing his old pickup truck which he assumed was being driven by LaRocco. (Jim Ogle Dep. 15:1-16:25.) The officers in pursuit passed him in the road except for Lantz who had stopped to tell Mr. Ogle to go home after Mr. Ogle tried to get some information regarding the situation. (Jim Ogle Dep. 17:9-23; Lantz Dep. 53:1-10.) During this brief conversation, Jim Ogle did not have the chance to identify himself or his association with LaRocco. (Jim Ogle Dep. 17:12-13.) Approximately 18 minutes after initiating the pursuit, at approximately 9:03 p.m., Deputy Varilek radioed that the vehicle had came to a stop and that a male subject dressed in black ran west into an adjacent field. (Pl.'s Ex. G at 18, 25, 26; Pl.'s Ex. H at 2.) The stubble field that LaRocco entered was approximately one square mile surrounded by a barbed wire fence, and located about one mile outside the Harrold city limits. (Lantz Dep. 53:16-24.) There were no residences nearby. (Doc. 47 at ¶ 19.) At the time that LaRocco entered the field it was dark and cloudy.

5

The officers called out commands for LaRocco to drop the weapon. (Lantz Dep. 7:16-17; Griffith Dep. 12:8-12.) LaRocco shouted obscenities at the officers and began waving a black pistol in the air and then would point it at officers, at his head, and in his mouth (Pl.'s Ex. L at 3; Pl.'s Ex. F at 1; Lantz Dep. 7:16-20.) After being told by Lantz to go home, Jim Ogle turned around and proceeded to follow the vehicles until he came to a stop behind the pickup and a patrol car. (Jim Ogle Dep. 19:8-14.) LaRocco was in the field. Mr. Ogle tried to identify himself and told Duncan that he would like to go out and talk to LaRocco. (Jim Ogle Dep. 23:11-23.) Duncan told him to get back in the vehicle and threatened him with obstructing justice. (Jim Ogle Dep. 23:11-19; Pl.'s Ex. G at 25.) LaRocco then began to walk west further into the field until the officers no longer could see him from the road. (Pl.'s Ex. G at 26; Lantz Dep. 21-23; Griffith Dep. 12-13.) Varilek advised Duncan to find a field approach entrance and enter the field to keep a light on LaRocco so officers could monitor his actions. (Pl.'s Ex. L at 3; Lantz Dep. 7:25-8:4.) Jim Ogle gave Duncan directions as to where he could access the field with his vehicle. (Jim Ogle Dep. 26:21-27:14.) It took Duncan no more than a couple minutes to find LaRocco with his spotlight. (Pl.'s Ex. G at 26; Griffith Dep. 14:10-11.) Plaintiff's expert, Keven Johnson, testified that it was reasonable for the offers to keep visual surveillance of LaRocco when he was in the field to know his whereabouts. (Johnson Dep. 57:20-58:4.)

Hughes County Sheriff Mike Liedholt arrived on scene. In February 2007, Liedholt had been involved in assisting other officers in talking LaRocco down from the roof of the Stables Bar. (Liedholt Dep. 15:2-18.) Lantz advised Liedholdt that LaRocco was out in the field with a pistol and Lantz got into Liedholt's vehicle with his shotgun. (Pl.'s Ex. L at 3.)

At approximately 9:15 p.m., as Liedholt and Lantz were heading into the field, Forster transmitted a message over the radio that according to LaRocco's girlfriend, Gerry Ogle, LaRocco was armed with a black BB gun. (Pl.'s Ex. 1; Pl.'s Ex. G at 26, Liedholt Dep. 29:7-11; Pl.'s Ex. P at 3.) After being dropped off at Stables Bar by her mother, Gerry Ogle was stopped by Forster on her way to meet up with the officers and informed him that she believed the only gun LaRocco possessed was a BB gun. Duncan replied that it better be because at that point,

6

LaRocco was lying down aiming at him with the pistol gripped in his two hands. (Pl.'s Ex. F at 2; Pl.'s Ex. G at 26.) Griffith and Liedholt joined Duncan in the field and formed a semi-circle around LaRocco. (Griffith Dep. 16:15-22.) The officers used binoculars and night vision equipment but were unable to confirm Gerry Ogle's report that the gun was only a BB gun. (Pl.'s Ex. O at 3; Griffith Dep 18:19-21:2.) Kevin Johnson, the expert for Plaintiff, stated that the officers were correct in presuming that the gun was a real gun unless they had been able to affirmatively confirm that it was a BB gun or other non-lethal weapon. (Johnson Dep. 35:13-36:8.) The officers in the field did not have any non-lethal bean bag rounds available to them and at approximately 9:21 p.m., they radioed to see if any officers with bean bag rounds could assist. (Pl.'s Ex. P at 3; Pl.'s Ex. G at 28.) Officer Boyd radioed that he had bean bag rounds and was driving up the road west of the field. (Pl.'s Ex. P at 3-4.)

As LaRocco moved about in the field, the officers would move their vehicles to keep him within the range of their headlights and spotlights. (Griffith Dep. 16:19-22.) The officers continued to order LaRocco to drop the gun and he continued to yell back. (Griffith Dep. 17:22-24.) LaRocco would at times point the gun towards officers, put the gun to his head and into his mouth and would then continue to walk further into the field. (Lantz Dep. 8:7-9; Griffith Dep. 19:1-5.) Griffith stated that he saw LaRocco stumble several times throughout the entire encounter. (Griffith Dep. 45:9-19.) LaRocco then asked "who are you, what's your name," and at that point Lantz identified himself and attempted to engage LaRocco in a dialogue. (Griffith Dep. 17:24-18:7.) LaRocco told officers that he wanted to talk to his girlfriend and Officer Lantz advised him that the officers would allow him to do that if he just dropped the gun. (Pl.'s Ex. L at 3; Lantz Dep. 51:25-52:20.) LaRocco then stated "No, you guys are just going to arrest me. I know how you are." (Pl.'s Ex. L at 3; Lantz Dep. 8:13-15.) Officer Lantz told LaRocco that he was there to help him and that he needed to drop the weapon and get on the ground. (Pl.'s Ex. L. at 3; Lantz Dep. 8:10-15.)

LaRocco soon became enraged again and began to move south into a draw that had tall grass, about knee high. (Pl.'s Ex. F at 2; Sheldon Dep. 77:14-18; Lantz Dep. 8:15-19.) Duncan entered the grassy area and turned his vehicle towards LaRocco to keep him illuminated. (Pl.'s

7

Ex. F at 2.) Sheldon arrived on the scene and parked his vehicle approximately 38 yards behind and to the east of Duncan's vehicle, next to Leidholt's vehicle. (Pl.'s Ex. J; Lantz Dep. 58:9-13.) Sheldon was aware that LaRocco was the individual who had been involved in the Stables Bar incident in February 2007, but did not know that both the incident in February and that evening's events involved threats of suicide by LaRocco. (Sheldon Dep. 41:22-42:1, 36:5-9, 46:14-16; 91:14-22.) Officer Lantz ran toward Sheldon's patrol vehicle and positioned himself with his shotgun on the hood of Sheldon's vehicle while Sheldon retrieved his canine. (Pl.'s Ex. L at 3.) Positioned on the other side of Leidholt's vehicle was Griffith's vehicle. (Griffith Dep. 17:5-13.) LaRocco began to move towards Duncan's vehicle and began yelling at Duncan to back up. (Pl.'s Ex F. at 2; Pl.'s Ex. 2.) Not knowing who might be arriving behind him on foot or by vehicle, Duncan exited his vehicle instead of backing up, drew his weapon and took cover behind his vehicle while ordering LaRocco to drop his weapon. (Pl.'s Ex. F at 2.) LaRocco started to approach Duncan's vehicle and stopped at the opposite corner of where Duncan was positioned behind his vehicle, shouting and waving his gun. (Pl.'s Ex. 2; Sheldon Dep. 37:17-23.) Sheldon testified that at that moment he was concerned that LaRocco may fire upon Duncan. (Sheldon Dep. 37:17-23.) Griffith and Leidholdt then drove their vehicles up parallel to Duncan's to distract LaRocco. (Pl.'s Ex. G at 19; Pl.'s Ex. 2.) At that moment, LaRocco turned and pointed his gun at Griffith and Leidholt and their respective vehicles. (Pl.'s Ex. 2.) From this distance, Duncan observed LaRocco's weapon and still could not determine whether LaRocco was carrying a BB gun as stated by his girlfriend, Gerry Ogle. (Pl.'s Ex. F at 2.) Duncan observed that the bore of the barrel was black and had the diameter consistent with a 9mm gun. (Pl.'s Ex. F at 2.)

LaRocco started walking away from such close proximity to Duncan's vehicle. (Sheldon Dep. 39:16-21.) When Sheldon and Lantz had reached Duncan's vehicle with Sheldon's canine, LaRocco had focused his attention in their direction. (Sheldon Dep. 18:19-22, 67:20-68:2) Sheldon was kneeling behind the left rear bumper of Duncan's vehicle with his canine trained on LaRocco. (Sheldon Dep. 25:14-18.) Lantz was providing lethal cover to Sheldon positioned just to the right and behind Sheldon and was not behind cover of the vehicle. (Lantz Dep. 15:8-11; Pl.'s Ex. J.) Officers repeatedly told LaRocco to drop the gun. (Pl.'s Ex. 2.) Deputy Duncan

8

can be heard on the video asking "You got buckshot?" (Pl.'s Ex. 2; Pl.'s Ex. G at 19.) Trooper Lantz replied, "I got buckshot." (Pl.'s Ex. 2; Pl.'s Ex. G at 19.) Deputy Duncan then said what sounds like, "Well do it. Well do it. Need you to buckshot him." (Pl.'s Ex. 2; Pl.'s Ex. G at 19.; Pl.'s Ex. F at 3.) Neither Officer Lantz nor Sheldon recall Duncan's statements that Lantz should buckshoot LaRocco. (Sheldon Dep. 29:25-30:2; Lantz Dep. 67:24-68:8.) Sheldon gave the subject at least two commands to drop the weapon or he was going to send in the dog. (Pl.'s Ex. G at 19, Sheldon Dep. 17:12-16.) At this point, LaRocco was standing approximately 78 feet in front of the officers and it appeared that he was going to comply with officers orders and had dropped the gun down by his right side. (Pl.'s Ex. J; Griffith Dep. 34:22-24.) Plaintiff's expert, Kevin Johnson, stated that if LaRocco was in possession of a 9 mm handgun as he had reported to law enforcement over the phone, that a shot fired from this distance could be fatal to the officers in the field. (Johnson Dep. 71:1-8.) LaRocco then grabbed the gun with both hands and was pointing it towards Duncan, Sheldon, and Lantz and then fell to a kneeling or deep crouching position while continuing to point the gun in their direction. (Sheldon Dep. 90:24-91:7; Griffith Dep. 34:23-35:4, 45:20-23.) Officer Lantz fired a single shot at LaRocco. The video from Duncan's patrol car indicates that the shot was fired approximately 30 seconds after Duncan had told Lantz to buckshoot LaRocco, and according to Sheldon, no more than one minute after he and Lantz had moved up to Duncan's vehicle. (Pl.'s Ex. 2, Pl.'s Ex. G at 19; Sheldon Dep. 23:12-15.)

After the shot was fired, Lantz looked to his right and saw Pierre Police Officer Boyd carrying some type of rifle. (Pl.'s Ex. L at 3.) None of the officers reported seeing Officer Boyd enter the field as they were all trained on LaRocco at the time. Lantz continued to give the subject commands to drop the weapon and he and Boyd and Duncan approached LaRocco to secure his weapon. (Pl.'s Ex. F at 3; Pl.'s Ex. L at 3.) Leidholt approached and handcuffed LaRocco. (Pl.'s Ex. F at 3.) After turning LaRocco over, the officers assessed his wounds and LaRocco did not appear to be conscious. (Pl.'s Ex. F at 3.) Duncan immediately radioed for an ambulance at approximately 9:29 p.m. (Pl.'s Ex. K at 6; Pl.'s Ex. P at 4.) The officers removed the handcuffs and began to apply pressure to the wounds and to administer CPR. (Pl.'s Ex. K at 6.) Trooper Stahl, a member of the High Risk Entry Team, had just stopped on the gravel road

9

adjacent to the field to put on his tactical gear when he heard Duncan over the radio calling for the ambulance in the field. (Pl.'s Ex. N. At 1.) The majority of the other members of the High Risk Entry Team were about five miles out when the request for an ambulance was made. (Metzinger Dep: 35:16-19.)

On September 11, 2008, Gerry Ogle, as Special Administrator of the Estate of Anthony LaRocco, deceased, and as Guardian ad litem for their minor children, filed a Complaint against Lantz and Sheldon in the United States District Court for the District of South Dakota Southern Division. On April 6, 2009, Plaintiff filed and Amended Complaint. The Amended Complaint alleges the following three counts against both Defendants: (1) a Section 1983 claim based upon the use of excessive force in violation of the Fourth Amendment; (2) a wrongful death claim under South Dakota law; and (3) a Section 1983 claim for the violation of LaRocco's minor children's substantive due process rights under the Fourteenth Amendment to a continued relationship with their father. Plaintiff has since withdrawn her substantive due process claim.

Defendants have moved for summary judgment on all counts. In support of their motion for summary judgment, Defendants argue that: (1) they are entitled to qualified immunity on the plaintiff's federal claims brought pursuant to section 1983; (2) they are entitled to statutory immunity on the plaintiff's state law claim pursuant to SDCL 3-21-9; and (3) Plaintiff's state law claims are barred on the basis of assumption of risk and contributory negligence.

In response, Plaintiff has filed a brief in opposition to Defendants' Motions for Summary Judgment. To refute Defendants' arguments that they are entitled to qualified immunity on Plaintiff's federal law claims, Plaintiff cites the deposition and report of her retained expert, Kevin Johnson, who opines that Sheldon and Lantz did not have a reasonable belief that they and others were in danger of physical harm. In his deposition Mr. Johnson based his conclusion on the following circumstances:

Q.    In view of those facts, it's your opinion that Trooper Lantz did not have a reasonable belief that he and the others near him were in danger of physical harm?
A.    I would say no.

10

Q.     And why not?

A.     I would say the totality of circumstance to me is at that very moment they all had cover. The lights, meaning headlights, spotlights, and it was 9 – I'm not sure exactly when the shot was fired. Somewhere around 9:20, somewhere in that area. Anthony obviously was suicidal, very stressed. Found out that he had alcohol in his system.

Q.     Later they found out.

A.     Right. But he had alcohol in his system. He was very nervous, stressed with the officers yelling at him and so forth. A mental person like that, it's going to stress them out even more. They were roughly 25, 26, 27 yards away, and with the lights shining in his eyes at that time of night, I'm guessing he didn't see a whole lot, other than a lot of conversation going on at him. Besides that immediate right there, what I just stated, they had the SWAT team two minutes away when the shot was fired.

Q.     I want to keep my question focused right at the time the shot was fired.

A.     That's what I will say. With all those things I just stated, one step to the left for either Officer Lantz or whomever, the cover was there, they had everything they needed. They also could have backed off that situation. He did not fire a shot up to that point. They were out there 13 or 14 minutes. This guy did not fire a shot at any of that time. No shots were fired up to that time. They very easily could have backed of from the situation, because up to that point it was nothing but a misdemeanor out there. No felony had been committed until they got to that field. To me, the circumstances did not allow that kind of shot to be made.

Q.     Based on your reading of the materials you reviewed, are you telling me that it would have been impossible for Mr. LaRocco to fire a handgun and hit one of these officers under those circumstances had the handgun been real?

A.     I suppose he could have fired the weapon at anytime. But if they would have gave him the distance that I feel they should have gave, along with all those other circumstances that I gave, I don't feel there was any cause for deadly force. I feel excessive force, deadly force was used.

Q.     I understand you are looking at it under what you believe is the totality of the circumstances. I want to limit my question to the circumstances, the conditions that existed at the time the shot was fired.

A.     I'm still going to say no.

Q.     Why not?

A.     I just explained them. That would be my answer.

Q.     Even though you admit that the officers had a right to believe that gun was a genuine gun.

A.     They had the right to believe it was a genuine gun. That's correct.

Q.     They were at least exposed or partially exposed at the time Mr. LaRocco pointed that gun at them using two hands?

A.     Whether they were exposed or not, I'm going by the report. They had cover of their vehicles. They had cover of darkness. I'm going by their reports.

11

Q.   Whatever happened, whatever the lighting conditions were, it was light enough so that when Mr. LaRocco pointed that gun just prior to the time he was shot, he pointed it right at people. Didn't he?

A.   I don't think he knew who he was pointing it at: I think he was just pointing at that direction, because that's where the lights were and that's where the voices were at. I don't honestly believe he could see anybody out there.

Q.   Why do you say that?

A.   Because I know what happens at night when you shine lights in an individual's eyes. That's why as officers, when you pull somebody over at night, you put your lights and your spotlights in the mirrors and rear-view mirrors so the subject or person cannot see how you approach a vehicle.

Q.   So is it your opinion that a reasonable officer in the position of Sheldon and Lantz should have assumed that even though the gun was pointing directly at them, that really the guy pointing the gun didn't know they were there?

A.   I'm sure he knew they were there. He could hear their voices. I can't say he knew he was pointing it at them. I would not say that.

Q.   That's poorly phrased. Should a reasonable officer in the position of Sheldon and Lantz have believed that Mr. LaRocco did not know he was pointing the gun directly at them at the time of the shot?

A.   That Officer Lantz and Sheldon, that they could see he was pointing the gun at them?

Q.   That's what they testified to. Didn't they?

. . . .

A.   That's what they said in their report. I can't dispute that. That's what they said.

. . . .

Q.   My question is would reasonable officers in their position seeing Mr. LaRocco pointing a gun directly at them not have a valid reason to believe Mr. LaRocco was, in fact, pointing the gun at them with the intent to shoot at them?

A.   I would say no. I don't think they knew what he was going to do. He was out there for 13 minutes pointing the gun in different directions. Many of the reports said that he was pointing the weapons toward them. What he wanted to do at that moment, I have no idea.

Q.   I don't know what Mr. LaRocco wanted to do. I'm just asking what a reasonable officer seeing the gun pointed directly at them had reason to believe that guy pointing the gun may shoot me.

A.   They probably did think that.

12

(Johnson Dep. 45:17-51:21). Mr. Johnson also stated that the officers should have used one of the several less deadly alternatives he believed were available to the officers at the time rather than using deadly force. (Johnson Dep. 54:1-55:24.)

Sheldon has also filed a motion to exclude the expert testimony of Plaintiff's expert, Kevin Johnson, on the basis that Mr. Johnson is not qualified to offer expert opinions concerning the use of police service dogs. In the event that the Court grants Sheldon's Motion to Exclude Expert Testimony, Sheldon argues in his brief in support of his motion to amend his summary judgment motion that he is entitled to summary judgment on Plaintiff's federal claims on the basis that no question of material fact exists as to his liability on these federal claims. Sheldon argues further that if the federal claims against him are dismissed, that the Court should not retain jurisdiction over Plaintiff's state law wrongful death claim.

## LEGAL STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment shall be entered "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In ruling on a motion for summary judgment, the Court is required to view the facts in the light most favorable to the non-moving party and must give that party the benefit of all reasonable inferences to be drawn from the underlying facts. *AgriStor Leasing v. Farrow*, 826 F.2d 732, 734 (8th Cir. 1987). The moving party bears the burden of showing both the absence of a genuine issue of material fact and its entitlement to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). Once the moving party has met its burden, the non-moving party may not rest on the allegations of its pleadings but must set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists. Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 257; *City of Mt. Pleasant v. Associated Elec. Coop., Inc.,* 838 F.2d 268, 273-74 (8th Cir. 1988).

13

## I.      Section 1983 Claim

Section 1983 provides a cause of action for "the deprivation of any rights, privileges, or immunities secured by the Constitution and law" by any person "under color of any statute, ordinance, regulation, custom, or usage, or any State or Territory." 42 U.S.C. § 1983. To state a cause of action under section 1983, a plaintiff must establish (1) that the defendant has deprived the plaintiff of a federal right; and (2) that the defendants did so under color of state law. *Gomez v. Toldeo,* 446 U.S. 635, 640 (1980).

In the present case, Plaintiff has brought a section 1983 action seeking to recover damages for the shooting death of Anthony LaRocco on the evening of October 20, 2007. Plaintiffs allege that Defendants' actions on that particular evening deprived LaRocco of his right to be free from excessive force under the Fourth Amendment to the United States Constitution.

Defendants have moved for summary judgment on Plaintiff's § 1983 claim on the basis that they are immune from suit pursuant to the doctrine of qualified immunity. "[W]hether summary judgment on grounds of qualified immunity is appropriate from a particular set of facts is a question of law." *Lambert v. City of Dumas,* 187 F.3d 931, 935 (8th Cir. 1999). Defendants, the proponents of the immunity in this case, bear the burden of "establish[ing] the relevant predicate facts, and at the summary judgment stage, [Plaintiff], the nonmoving party is given the benefit of all reasonable inferences." *Pace v. City of Des Moines,* 201 F.3d 1050, 1056 (8th Cir. 2000) (citation omitted). "In the event that a genuine dispute exists concerning predicate facts material to the qualified immunity issue, the defendant is not entitled to summary judgment on that ground." *Id.* (citation omitted). "'Predicate facts' include only the relevant circumstances and the acts of the parties themselves, and not the conclusions of others about the reasonableness of those actions." *Id.* "When there is no dispute among the parties as to the relevant facts, . . . a court should always be able to determine as a matter of law whether or not an officer is eligible for qualified immunity-that is, whether or not the officer . . . acted reasonably under settled law given the particular set of facts." *Id.*

i.       Officer Lantz

14

Government officials are entitled to qualified immunity from liability for civil damages arising from their use of force in the course of an arrest, investigatory stop or other seizure of a free citizen, *Graham v. Connor,* 490 U.S. 386, 395 (1989), so long as their conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). "The issue on the merits is whether the officer *violated the law* when the [seizure] was made, whereas the immunity question is whether the officer *violated clearly established law* when the [seizure] was made." *Gainor v. Rogers,* 973 F.2d 1379, 1383 (8th Cir. 1992) (citing *Mitchell v. Forsyth,* 472 U.S. 511 (1985)). "Although earlier cases involving 'fundamentally similar' facts can provide especially strong support for a conclusion that the law was clearly established, they are not necessary to such a finding." *Craighead v. Lee,* 399 F.3d 954, 962 (quoting *Hope v. Pelzer,* 536 U.S. 730, 741 (8th Cir. 2002). "[T]he issue is not whether prior cases present facts substantially similar to the present case but whether prior cases would have put a reasonable officer on notice that the use of deadly force in these circumstances would violate [a person's] right not to be seized by the use of excessive force." *Id.* Thus, if a law enforcement officer makes "a reasonable mistake as to the legality of his actions in the factual situation he confronted, he is entitled to the immunity defense." *Ngo v. Storlie,* 495 F.3d 597, 604 (8th Cir. 2007) (internal quotation and citation omitted).

"All claims that law enforcement officials used excessive force-deadly or not-in the course of making an arrest or other 'seizure' of a free citizen are properly analyzed under the Fourth Amendment." *Cole,* 993 F.2d at 1332 (citing *Graham,* 490 U.S. at 394-95). The Fourth Amendment guarantees citizens the right "to be secure in their persons . . . against unreasonable . . . seizures." U.S. Const. amend. IV. The use of deadly force, such as was used by Officer Lantz in this case, is reasonable if "the officer has probable cause to believe that the suspect poses a significant threat of serious physical harm, either to the officer or to others." *Tennessee v. Garner,* 471 U.S. 1, 11 (1985). The 'reasonableness' inquiry in an excessive force case is an objective one and is examined "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Ngo v. Storlie,* 495 F.3d 597, 602 (8th Cir. 2007) (quoting *Graham,* 490 U.S. at 396). "The calculus of reasonableness must embody allowance

for the fact that police officers are often forced to make split-second judgments-in circumstances that are tense, uncertain, and rapidly evolving-about the amount of force that is necessary in a particular situation." *Graham,* 490 U.S. at 396.

Plaintiff does not appear to argue that Lantz's belief that LaRocco posed a serious threat to his physical safety and to the physical safety of Sheldon and Duncan was unreasonable at the time he shot LaRocco. Instead, Plaintiff relying primarily on the Sixth Circuit's decision in *Kirby v. Duva,* 530 F.3d 475 (6th Cir.2008) and the cases cited therein, *Sigley v. City of Parma Heights,* 437 F.3d 527 (6th Cir. 2006) and *Estate of Starks v. Enyart,* 5 F.3d 230 (7th Cir.1993), appears to argue that Lantz unreasonably placed himself in harm's way. Plaintiff's expert, Kevin Johnson, states that while Lantz and the other officers were justified in following LaRocco out into the field to keep him illuminated and to monitor his actions, they should have done so from a greater distance and remained behind the cover of their vehicles until the High Risk Entry Team and negotiator had arrived and been given a chance to diffuse the situation. Johnson states further that he believes that it was unreasonable for the officers to have continued to yell repeatedly at LaRocco, who was obviously suicidal and stressed, to drop his weapon and to get on the ground. "Rather, than waiting for assistance to arrive so that the situation could be diffused, or using one of the many forms of non-deadly force available," Plaintiff argues that "Trooper Lantz instead escalated the situation, continued yelling at LaRocco, and then took an aggressive position and fired his shotgun at LaRocco's head." (Pl.'s Br. in Opp'n to Defs.' Mots. for S.J. at 17-18.)

Contrary to *Starks* and the other cases cited by Plaintiff, the Eighth Circuit has stated that "[t]he Fourth Amendment prohibits unreasonable seizures, not unreasonable or ill-advised conduct in general. Consequently, we scrutinize only the seizure itself, not the events leading to the seizure, for reasonableness under the Fourth Amendment." *Cole,* 993 F.2d at1333 (internal citations omitted); *see also Schultz v. Long,* 44 F.3d 643, 648 (8th Cir. 1995) (quoting *Cole,* 933 F.2d at 1333). In *Cole v. Bone,* Missouri state troopers were sued under § 1983 for the fatal shooting of a driver of a tractor-trailer rig during a high speed pursuit. The court stated that in examining the information that the officer possessed at the time of his decision, that he had probable cause to believe that the truck posed an imminent threat of serious physical harm to

innocent motorists as well as to the officers themselves. *Cole,* 993 F.2d at 1333. The court found that,

> [The officer] had seen the truck force several motorists off the road and threaten the safety of many others. He could reasonably have believed that the truck would continue to threaten the lives of travelers as it continued speeding down the crowded interstate highway. He knew that the truck had been careening through traffic for at least fifty miles and that it showed no signs of stopping. He knew further that all other attempted means to stop the truck-the rolling roadblock, the stationary roadblock, the shots at its tires and radiator-had been unsuccessful.

> Moreover, [the officer] had probable cause to believe that [the driver of the truck] had committed a crime. He had received a radio report that the truck had attempted to force several police cars off the road in Kansas City. Additionally, he believed that [the driver of the truck] had attempted to ram his and [another trooper's] vehicles. Attempting to strike police officers with an automobile constitutes first degree assault under Missouri law. In light of all of the information that was available to him, then, we find that [the officer's] use of deadly force was constitutionally reasonable under [*Tennessee v. Garner,* 471 U.S.1 (1985)].

*Cole,* 993 F.2d at 1333-34.

In another Eighth Circuit case, *Schultz v. Long,* 44 F.3d 643 (8th Cir. 1995), the plaintiffs, like Plaintiff in the present case, argued that the officers' use of deadly force was excessive because the officers unreasonably created the need to use such force by their actions prior to the moment of seizure and that the officers should have responded to the situation in a different manner by waiting for a supervisor or SWAT team to arrive. *Id.* at 648. In *Schultz,* officers were called to assist parents in committing their son, a paranoid schizophrenic, to a mental hospital. When the officers arrived, they found the man in the basement behind a chest-high barricade consisting of tables, chairs, boxes, and other items. The individual became angry during his negotiations with the officers and began to hurl bricks at them. When the individual ceased throwing bricks, he looked around confusedly and one of the officers decided to try to get past the barricade to subdue the individual because after being assaulted with bricks, the officer believed the individual posed a danger to the officers' safety. The officer became entangled in the barricade and as he attempted to free himself, the individual retrieved a long-handled, double-bladed ax and began approaching him at a very deliberate pace while holding the ax with

17

both hands in a cocked position, with the blade at the top and at about head level. Seeing this, the other officer unholstered his gun, pointed it at the individual and warned him twice to "drop the ax or he'll shoot." The individual did not respond to these warnings and when he approached within six to eight feet of the officer entangled in the barricade, the officer started firing at him.

The court in *Schultz* affirmed the district court's decision to exclude evidence that the officers created the need to use deadly force by their actions prior to the moment of seizure, finding that such evidence was irrelevant to the court's reasonableness inquiry. *Id.* at 649. The court explicitly rejected the Seventh Circuit's conclusion in *Starks* that an officer's actions prior to the moment of seizure are relevant to the court's reasonableness inquiry, finding that such a conclusion was contrary to its holding in *Cole,* 993 F.2d 1328 and ran counter to the spirit of *Graham,* 490 U.S. 386 in which the United States Supreme Court indicated that only facts known to the officer immediately prior to the moment of seizure were to be factored into the "reasonableness" calculation. *Id.* at 649, n.3.

In examining the facts known to Lantz at the moment of the shooting, as the Court is obligated to do, the Court concludes that Lantz's belief that LaRocco posed a serious threat to his physical safety and to the physical safety of officers Duncan and Sheldon who were also in the line of fire from LaRocco's gun was not objectively unreasonable. Right before LaRocco was shot, officers reported that LaRocco appeared that he was going to comply with officers' orders to drop his weapon because he had lowered his gun down by his right side. Instead of dropping his gun, however, LaRocco assumed for the first time Lantz had been in the field, a two-handed grip on his gun and fell to his knees or into a deep crouch, pointing the gun directly at officers Lantz, Sheldon, and Duncan. Although officers Sheldon and Duncan were at least partially behind the cover of their vehicles, Lantz was fully exposed as he was providing Sheldon lethal cover from a short distance behind and to Sheldon's right as Sheldon looked for an opportunity to release his canine. At the time LaRocco assumed this position, he was approximately 78 feet away from LaRocco. Plaintiff's expert, Kevin Johnson, stated that officers were correct in assuming LaRocco's gun was a pistol given their inability to confirm that it was a BB gun and that it was certainly possible for LaRocco to have inflicted serious bodily harm upon one of the officers from that distance had the handgun been a real pistol.

The fact that Lantz had been informed that LaRocco was intending to commit suicide by cop, that LaRocco had exhibited suicidal behavior in the field, and had waved and pointed his gun in the direction of officers numerous times throughout the encounter without firing a shot does not render unreasonable Lantz's belief that LaRocco posed a serious threat to his physical safety at the time he fired his weapon. The Court is simply unwilling to put officers in a situation whereby they cannot defend themselves from a threat of deadly force if it appears that a suspect is mentally ill and suicidal. *See Hassan v. City of Minneapolis Minnesota,* 489 F.3d 914, 919 (8th Cir. 2007) (quoting *Sanders v. City of Minneapolis, Minn.,* 474 F.3d 523, 527 (8th Cir. 2007) ("Knowledge of a person's disability simply cannot foreclose officers from protecting themselves, the disabled person, and the general public when faced with threatening conduct by the disabled individual.").

The confrontation between LaRocco and the officers escalated rapidly. Just minutes before LaRocco was shot, he, for the first time that evening, approached the corner of the patrol vehicle opposite of where Duncan was taking cover, while waving and pointing his gun. Sheldon testified that he thought LaRocco was going to fire upon Duncan and LaRocco's actions at that moment appeared threatening enough to Leidholdt and Griffith such that they immediately drove their vehicles parallel to that of Duncan's in order to distract LaRocco from Duncan's direction. Approximately one minute and twenty seconds after the camera on Duncan's vehicle captured LaRocco walking directly at Duncan's vehicle, LaRocco, from approximately 78 feet away, held his gun with a two handed grip, pointed it directly in the officers' direction, and fell to his knees or into a deep crouching position. LaRocco had made threats to shoot and kill the officers in his calls to 911 and throughout his confrontation with the officers in the field. Whether or not LaRocco ultimately would have fired at officers is exactly the type of "Monday morning quarterback[ing]," *Schultz,* 44 F.3d at 649, that this Court may not engage in determining whether Lantz's actions were reasonable under the circumstances.

This is not to say that circumstances surrounding the use of deadly force are always irrelevant if such evidence supports a contradictory interpretation of the events at the moment of seizure. *Gardner v. Buerger,* 82 F.3d 248, 253-54 (8th Cir. 1996); *Ludwig v. Anderson,* 54 F.3d 465, 473-74 (8th Cir. 1995). In *Gardner*, the wife of an individual brought a section 1983 suit

against a Missouri police officer who shot and killed her husband while serving an *ex parte* order of protection. *Id.* at 250. The officer was the only witness to the shooting and testified that when the plaintiff's husband opened the door and explained his purpose and told the husband he had to leave the house, the husband became enraged and threatened to get a gun. *Id.* The officer said something like, "You grab the gun and I will kill you," and he then went after the husband. *Id.* According to the officer, the two men ended up in the middle of the dining room floor, with the husband face down and with the officer on top, gun drawn and pointed. *Id.* The officer testified that he tried to handcuff the husband, but the husband somehow escaped. *Id.* The husband tried to pick up a chair but was unable to do so because it was stuck under a table. *Id.* The officer yelled "Drop the chair" and "Don't do it. I'll shoot, I'll kill you." *Id.* The officer admitted that the husband never had brandished a weapon, and never hit him. *Id.* The plaintiff testified that she had told the officer the only gun in the house was locked in a safe and that when the officer exited the house, he stated "Lady, I had to shoot him. He was going to get a gun." *Id.* The plaintiff also testified that the officer told her he had shot her husband in the back of the head. *Id.*

The district court in *Gardner* granted the officer's motion for judgment as a matter of law on the basis that the plaintiff failed to produce any proof as to what actually happened at the precise time of the shooting and that her case rested on speculation and on an appeal to the jury to disbelieve the officer's story. *Id.* at 250, 252.

On appeal, the Eighth Circuit reversed the trial court's decision, finding that the plaintiff presented sufficient evidence to permit a reasonable jury to conclude that the officer's use of deadly force was objectively unreasonable. *Id.* at 254. On appeal the court found, contrary to the lower's court's finding, that plaintiff was not asking the jurors to disbelieve the officer's testimony and to speculate as to what might have transpired at the moment the officer shot her husband, but rather was asking the jury to believe and draw inferences from the following evidence:

[The officer] went into [the plaintiff's] house to serve an order of protection and came out a few minutes later having shot [her husband] through the back of the

20

head with a .357 Magnum. [The officer] repeatedly threatened to shoot her husband. [Her husband] never struck [the officer], and he never used or even had a weapon. Finally, [the plaintiff] told [the officer] that the guns in the house were in a safe.

*Id.* at 252. The court concluded that the testimony given was sufficient enough to permit a reasonable jury to infer that the officer used excessive force. *Id.* at 254.

The court in *Gardner* contrasted the facts of this case with those found in *Cole* and *Schultz* in which it concluded that the circumstances surrounding the shootings in those cases was irrelevant to the court's reasonableness inquiry. The court stated that,

In *Cole,* an out-of-control truck driver was barrelling down the interstate, creating grave danger both to police officer and to other drivers. And in *Schultz,* the psychotic plaintiff was advancing on a police officer with a double-bladed axe. Given these facts, we found that the use of force was objectively reasonable. In this case, by contrast, we know that an unarmed man was shot in the back of the head. From this evidence, [the plaintiff] wants the jury to infer that the shooting itself, not just the surrounding circumstances, was unreasonable. Unlike the evidence in *Cole* and *Schultz*, the evidence in this case permits such an inference.

*Gardner,* 82 F.3d at 254.

The Court finds that unlike in *Gardner,* the surrounding circumstances that Plaintiff in the present case seeks to introduce do not permit a contradictory interpretation of events at the moment and the seconds before Lantz shot LaRocco. Rather, Plaintiff is asking the jury to infer that the Lantz's use of force was excessive on the basis that he engaged in unreasonable conduct prior to the moment of shooting. Plaintiff's expert, Kevin Johnson, stated that it was unreasonable for the officers to continue yelling at a man who was obviously suicidal and stressed to drop his weapon and to get down on the ground. He stated further that they should have monitored LaRocco's actions from an even greater distance and remained behind the cover of their vehicles until the High Risk Entry Team and negotiator arrived and had been given a chance to diffuse the situation. The Court agrees with those opinions. However, under Eighth Circuit law as set forth in *Cole* and *Schultz*, these facts are irrelevant to the Court's reasonableness inquiry because they do not permit a contradictory interpretation of the

circumstances as they existed at the moment Lantz shot LaRocco. Were this Court to follow the analysis used by the Sixth Circuit in also considering the events leading up to the shooting, then the result of these motions could well be different.

The fact that there exist questions of fact as to whether other less obtrusive alternatives, such as utilizing Sheldon's canine to subdue LaRocco, were available to Lantz does not alter this Court's conclusion that Lantz's decision at that moment to use deadly force was not objectively unreasonable. Although the Eighth Circuit in *Cole* acknowledged that courses of action other than the use of deadly force may have conceivably been available to the officer in that case, the court stated that "[t]he Constitution, however, requires only that the seizure be objectively reasonable, not that the officer pursue the most prudent course of conduct as judged by 20/20 hindsight vision." *Cole,* 993 F.2d at 1334. "It may appear, in the calm aftermath, that an officer could have taken a different course, but we do not hold the police to such a demanding standard." *Gardner,* 82 F.3d at 251. Even assuming that Sheldon had an opportunity to release his canine, Lantz was not required to utilized this less lethal force because his belief that LaRocco posed a serious and immediate threat to his physical safety was not unreasonable.

For the foregoing reasons, the Court concludes under the Eighth Circuit test which must be applied that Lantz's use of deadly force at that moment was not objectively unreasonable and therefore Lantz's motion for summary judgment on Plaintiff's section 1983 claim is granted.

ii.    Officer Sheldon

In her Amended Complaint, Plaintiff alleges that a reasonable officer in Officer Sheldon's position would have asserted control over Lantz and would have released his police dog rather than allowing his subordinate officer to subdue LaRocco by using excessive force. (Am. Compl. ¶ 32.)

The Eighth Circuit has recognized that "[g]overnment officials may be held liable for constitutional wrongs caused by their failure to train or supervise subordinates adequately," so

22

long as there is "a showing that a right secured by the Constitution or federal law was violated." *Cole,* 993 F.3d at 1334; *see also Clay v. Conlee,* 815 F.2d 1164, 1169-70 (8th Cir. 1987).

Because the Court finds that Lantz's use of deadly force was objectively reasonable and did not violate LaRocco's rights under the Fourth Amendment to be free from excessive force, there is no underlying violation of a Constitutional right for which Sheldon may be found liable. The fact that LaRocco may have been subdued using less intrusive means is irrelevant to the question of Lantz or Sheldon's potential liability because the Court has concluded that Lantz's belief that LaRocco posed a serious threat to his physical safety was objectively reasonable.[2] *Cole,* 993 F.2d at 1334 ("[T]he Constitution, however, requires only that the seizure be objectively reasonable, not that the officer pursue the most prudent course of conduct as judged by 20/20 hindsight vision.").

## II.     State Law Claims

In Count II of Plaintiff's Amended Complaint, Plaintiff pleads a cause of action under South Dakota law for wrongful death in which she alleges that: (1) "Defendants owed a duty of care to the Plaintiff and Anthony LaRocco to not use excessive force in seizing Anthony on October 20, 2007"; (2) "Defendants breached their duties owed to Plaintiff and Anthony LaRocco by wrongfully using excessive, deadly force against Anthony on October 20, 2007"; (3) "The Defendants' breach of duties owed to the Plaintiff and Anthony LaRocco were a direct and proximate cause of the wrongful death of Anthony LaRocco and directly and proximately resulted in substantial injuries and damages to the Plaintiff, including but not limited to Anthony's pain and suffering before his death, economic loss, including but not limited to medical and funeral expenses and loss of future income and support, and loss of Anthony's love,

---
[2]

For this reason, the Court finds that Sheldon's Motion to Exclude the testimony of Plaintiff's expert, Kevin Johnson, as it pertains to Mr. Johnson's opinion regarding police canine procedures is moot. Even though Mr. Johnson believes that Sheldon had an opportunity to deploy the canine rather than permitting Lantz to use deadly force, failure to use less intrusive force under these circumstances and the Eighth Circuit test does not render unconstitutional Lantz's use of deadly force in the face of a serious and immediate threat to his physical safety.

support, comfort, aid, counsel, society, companionship, guidance, protection and services, all in an amount to be determined by a jury. Defendants are liable to the Plaintiff for such damages under SDCL Chpt. 21-5." (Am. Compl. ¶¶ 36-38.) Defendants have moved for summary judgment on Plaintiff's state law claims on the basis that they: (1) are entitled to statutory immunity pursuant to SDCL 3-21-9; and (2) such claims are foreclosed by assumption risk and contributory negligence.

The Court finds that in essence, the duty which Plaintiff alleges Defendants to have violated is the duty not to use excessive force against LaRocco. As stated above, all claims alleging the use of excessive force are to be analyzed under the Fourth Amendment. *Cole,* 993 F.2d at 1332 (citing *Graham,* 490 U.S. at 394-95). Because the Court concludes as a matter of law that Defendants' use of force was objectively reasonable under the Fourth Amendment, summary judgment is also proper as to Plaintiff's wrongful death claim.

Even if Plaintiff had stated a claim of negligence under South Dakota law, the Court concludes that Defendants would be entitled to immunity because such conduct involved the exercise of their discretionary functions. "A public officer acting within the general scope of his authority is not subject to tort liability for an administrative act or omission if (a) he is immune because he engaged in the exercise of a discretionary function, (b) he is privileged and does not exceed or abuse the privilege, or (c) his conduct was not tortious because he was not negligent in the performance of his responsibility." *Bego v. Gordan,* 407 N.W.2d 801, 809 n.11 (S.D. 1987) (citing Restatement of Torts (Second) § 895D(3) (1979)); *see also Cassazza v. South Dakota,* 616 N.W.2d 872, 875 (S.D. 2000) ("Whether a state employee, who is sued in an individual capacity, is entitled to immunity depends upon the function employee by the employee."); *Kruger v. Wilson,* 325 N.W.2d 851, 853 n.3 (S.D. 1982) ("Although the rule of immunity differs between state and municipal entities, the same factors, to-wit, whether the acts are discretionary or ministerial, are considered to determine whether such immunity extends to their respective employees."). In *Hansen v. S.D. DOT,* 584 N.W.2d 881 (S.D. 1998), the court defined a ministerial act as:

[A]bsolute, certain, and imperative, involving merely the execution of a specific duty arising from fixed designated facts or the execution of a set task imposed by a law prescribing and defining the time, mode, and occasion of its performance with such certainty that nothing remains for judgment or discretion, being a simple, definite duty arising under and because of stated conditions and imposed by law. A ministerial act envisions direct adherence to a governing rule or standard with a compulsory result. It is performed in a prescribed manner without the exercise of judgment or discretion as to the propriety of the action. In short, once it is determined that the act should be performed, subsequent duties may be considered ministerial. If there is a readily ascertainable standard by which the action of the government servant may be measured, whether that standard is written or the product of experience, it is not within the discretionary function exception.

*Id.* at 886.

There is no doubt that under the facts of this case, officers Lantz and Sheldon were acting in their discretionary capacities out in the field and are thus immune from suit in their individual capacities.

For the foregoing reasons, the Court grants summary judgment in favor of Defendants on Plaintiff's state law wrongful death claim.

It is hereby ORDERED:

(1)  Defendant Sheldon's Unopposed Motion For Leave to Amend Motion for Summary Judgment, Doc. 58, is GRANTED.

(2)  Defendants' Motions for Summary Judgment, Docs. 42 and 46, are GRANTED.

(3)  Defendant Sheldon's Motion to Exclude Expert Testimony, Doc. 53, is DISMISSED AS MOOT.

Dated this __ day of May, 2010.

BY THE COURT:

Lawrence L. Piersol
United States District Judge

ATTEST:
JOSEPH HAAS, Clerk

By _____
Deputy